PHILLIP AGUINAGA, JR., a Minor, by his Mother and Next Friend, Tina Chavez, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (5th Division)   No. 1—91—4035

Opinion filed March 5, 1993.

Pappas, Power & Marcus, of Chicago (Debra K. Marcus and William R. Power, of counsel), for appellant.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Mardell Nereim, and Frederick S. Rhine, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Plaintiff, Phillip Aguinaga, Jr., a minor, appeals from the judgment entered on a jury verdict in favor of the defendant, City of Chicago (City). The plaintiff suffered a fractured femur while he was in the care of Louis Barrera (Barrera). Barrera testified at trial that plaintiff's injury occurred when he fell in a hole in a City of Chicago sidewalk.

On April 24, 1984, the minor plaintiff, Phillip Aguinaga, Jr. (Phillip), was at the home of his paternal grandparents, Gloria Aguinaga and her husband. Phillip had stayed overnight the previous night. At that time, the plaintiff was 2 years and 20 days old.

Dr. Warren M. Brown supervised the physicians who treated the plaintiff on the date of the injury. He testified that Phillip sustained "somewhere between an oblique and a spiral" fracture. Dr. Brown testified that he received the patient's history in writing and that the history he was given as to how the injury occurred was consistent with the injury itself. He stated "[t]hat the child could have had a fractured femur like that from somebody falling on top of him and from him falling underneath that person." When asked if he would say that this mechanism of the injury, *i.e.,* a person carrying a child, tripping and falling, is not unusual in causing a spiral femur fracture, Dr. Brown responded that he couldn't say that it was not

unusual, he could just say it wasn't unexpected. On cross-examination Dr. Brown testified that the manner in which Mr. Barrera reported the accident happening is not the only way it could happen. He did not have an opinion as to how the accident actually happened; he was simply stating that there is a possibility that it happened the way Mr. Barrera had indicated. Dr. Brown would not say that it was more likely it happened one way or the other.

Louis Barrera testified that at the time of the accident Tina Chavez, Phillip's mother, was his girlfriend. On April 24, 1984, Barrera took the 31st Street bus to the plaintiff's grandparents' house. He got off the bus at 31st and Aberdeen. Approximately 10 minutes after arriving at the Aguinaga residence, Barrera left carrying Phillip. He traveled from the sidewalk on the west side towards 31st Street. He was carrying Phillip right in front of him, in such a way that he could not see the sidewalk; he was facing Phillip, Phillip was facing him. Barrera walked toward the bus stop. He tripped and fell in a hole in the sidewalk, falling right on top of the plaintiff. During the fall Barrera heard something snap. This made him think the plaintiff was injured, even though the plaintiff did not complain of any pain. Barrera immediately took the plaintiff back to his grandparents' house. From there they went to pick up Phillip's mother and proceeded straight to the hospital.

Barrera further testified that he suffered a sprained ankle and scraped his kneecap in the fall. He has never sought medical treatment for any injury relating to the fall. Barrera identified pictures that depicted the hole he allegedly tripped in and testified that the hole was about three or four inches deep. He did not recall how Phillip hit the ground or how he hit the ground, where Phillip's legs or arms were positioned or anything of that nature. Barrera testified that he did not recall what part of his body hit Phillip's body, whether he put out his hand to break his fall or whether Phillip was crying after the incident.

Barrera testified that he had never seen the hole prior to tripping in it on April 24, 1984. When the accident occurred Barrera was alone with Phillip on the sidewalk, walking near the curb and directly towards a sign. Barrera did not recall if he had ever picked up Phillip at the Aguinagas' home prior to the date of the accident. When asked if he lived approximately four blocks from the Aguinagas at the time of this accident, Barrera replied that he did not remember, but subsequently acknowledged that he previously made a statement indicating that was where he lived. Defense counsel asked during the time that Barrera lived in that area if he would

sometimes walk around the streets. Barrera replied that he "never went out."

Gloria Aguinaga testified that Phillip is her grandson. She stated that on April 24, 1984, Barrera came to her house to pick up Phillip to take him home to Tina. Phillip and Barrera left the house and returned only a few minutes later. Barrera told her that he tripped in a hole down the street from where she lived. Mrs. Aguinaga testified that Phillip was about to pass out in pain and that when her husband took Phillip he screamed in pain. Mrs. Aguinaga had lived in that home for six years and the hole was there when she moved in. She identified pictures of the scene. Mrs. Aguinaga also stated that Barrera had picked up Phillip at her house on a few prior occasions.

William Kurnat testified that he had previously resided at 3154 South Aberdeen, Chicago. He owned the home in the early 70's. In the middle or early 80's a tree was removed from the sidewalk in front of the house. The tree had been cut down by the City of Chicago and a tree stump remained after the removal of the tree.

Jerry Dalton was called by the plaintiff as an adverse witness. At the time of trial he was employed by the bureau of forestry for the City of Chicago, streets and sanitation. Mr. Dalton testified that the only one that can plant or remove a tree from the front of their home in the City parkway is the department of bureau of forestry. He testified that there are two crews involved in removing a tree, one crew removes the top of the tree and a second crew follows at some other time and removes the stump. After the stump is removed, they backfill the area with the chips for a level surface. Mr. Dalton testified that the department of forestry does not come back to fill in such a hole permanently with cement or anything nor does it report to some other department within the City and ask it to come out and fill that hole permanently with cement. Mr. Dalton had no knowledge regarding whether the department of forestry removed a tree from in front of 3154 South Aberdeen nor did he have any information to refute Mr. Kurnat's testimony that a tree had been removed from the front of his house. He testified that the department of bureau of forestry retains records for seven years, at which time the records are destroyed. On cross-examination, Mr. Dalton was asked to estimate the size of the hole as depicted in a picture. He estimated the width of the hole to be 18 inches to 2 feet. When asked how deep the hole appeared, Mr. Dalton replied: "From that photo, it looks like it's level to me."

Robert Callbeck testified that he was the deputy commissioner of streets and sanitation. Plaintiff's counsel asked whether he would perceive a three- to four-inch hole two feet in diameter to be a hazard to a pedestrian in the public way. Mr. Callbeck replied that he would not; however, he did state that it was possible that someone might trip in such a hole.

Tina Chavez testified that Phillip was her son. On April 24, 1984, she asked Barrera to pick up Phillip from his grandparents' house. Later that day, Ms. Chavez took Phillip to the hospital where he remained hospitalized for two weeks. Dr. Pyati, Dr. Brown, Dr. Treister, Dr. Fink and Phillip's regular pediatrician all saw Phillip at various times. Ms. Chavez took Phillip to see Dr. Treister because she wanted a second opinion on his leg. She received Dr. Treister's name by calling St. Elizabeth's Hospital for a referral for an orthopedic pediatrician doctor. On the date of the accident she observed that Barrera's pants were ripped, he was bleeding from his knee, he was all covered with dirt, and his ankle was swollen.

Several days after the incident Barrera showed her the accident site. Ms. Chavez then identified a picture of the accident site and stated that at the time she viewed the hole it was about three to five inches deep and approximately one foot wide. At the time of the accident Ms. Chavez was engaged to Barrera. She had been seeing Barrera for about a year and a half prior to that date. On cross-examination Ms. Chavez testified that she was not present when Phillip broke his leg, and therefore, any information she would have about the incident is what had been told to her.

Phillip testified that he is aware that he broke his leg when he was two, but has no memory of the accident. He has pain in his leg once or twice a month. Phillip testified that he participates in gym class twice a week. He plays softball, basketball, racquetball, volleyball and handball in gym class. His favorite sport is baseball, and he plays in the Little League.

Dr. Michael Treister, another treating physician, testified that the history given by Barrera was consistent with the mechanism of injury and that a femur fracture can occur without much force at all. When he performed a physical examination, he measured Phillip's lower extremities and found the right lower extremity measured 1½ centimeters longer than the left. He recommended that Phillip obtain an extra sole for the bottom of his shoe a half inch in size to more or less equalize the two sides. On cross-examination, Dr. Treister testified that the only knowledge he had about

the incident is based on a history that was given to him in December of 1990.

Dr. Steven Lelyveld testified on behalf of the City as an expert witness. He testified that it was his opinion, to a reasonable degree of medical certainty, that it was very unlikely that the injury occurred in the manner testified to by Barrera. He has treated many children who were injured when adults fell while holding them and has never seen a spiral fracture of the femur in such a case, nor has he ever read or heard of a spiral fracture of a child's femur occurring in this manner. Dr. Lelyveld testified that the femur is the largest and strongest bone in the body, a spiral fracture of a child's femur requires tremendous, unprotected force applied in a twisting motion and such force will not normally occur in a fall because the adult will typically attempt to protect the child and himself, generally by stretching out a hand to break the fall and throwing the child to one side. Dr. Lelyveld stated that if the injuries had occurred as Barrera claims, there would have been injuries to Barrera himself sufficient to cause him to seek immediate medical attention.

Robert Grady testified on behalf of the City. He was employed by the Chicago Transit Authority as the director of street traffic and graphics. Mr. Grady testified that both currently and in 1984 there was not a bus stop at Aberdeen when the bus is traveling west on 31st Street. On cross-examination Mr. Grady acknowledged that sometimes a bus driver will let people off where there isn't a bus stop and that he had no knowledge of the circumstances surrounding the location where Barrera alighted the bus on April 24, 1984.

Dr. Michael Gonzalez testified that he is a physician specializing in the field of physical medicine and rehabilitation. Prior to seeing Phillip he reviewed the medical records of Phillip's treatment, which included the records from various doctors who had treated him including Dr. Treister, the hospital records, and X-ray films. In addition, he performed a physical exam of Phillip. He measured Phillip's legs, and he found a leg length discrepancy of about 1.3 centimeters. He stated that in measuring the femur he found a .3-centimeter difference in the femur and a one-centimeter difference in the tibia or lower part of the leg. Dr. Gonzalez testified that it was his opinion that the leg length discrepancy he observed was most likely due to the type of normal variant in growth that often is seen in people where one side is slightly longer than the other. He was then asked whether it is possible that the fracture Phillip sustained in 1984 could be a cause. Dr. Gonzalez replied that it

could possibly be a cause; however, he thought that it was more likely due to a variation in growth.

The plaintiff presents the following issues for review: (1) whether the trial court committed reversible error in failing to enter a directed verdict in plaintiff's favor and in failing to enter a judgment notwithstanding the verdict; (2) whether the jury verdict in favor of the City is against the manifest weight of the evidence; (3) whether the trial court erred in allowing the City's expert to render speculative expert opinions based upon facts, and assumptions derived from facts, not in evidence; (4) whether the trial court erred in allowing the City to cross-examine the plaintiff's treating physician as though he were an expert witness; (5) whether the trial court committed reversible error in excluding evidence of the City's repair and inspection policies; and (6) whether certain jury instructions were permissible.

The City has filed a conditional cross-appeal, contending that in the event this court orders a new trial, it should hold that Dr. Lelyveld should be allowed to testify at trial that the cause of the plaintiff's injury was probably child abuse.

For the following reasons, we affirm the decision of the trial court. Accordingly, we do not consider the City's cross-appeal.

## I

The plaintiff argues that not only was he entitled to a directed verdict at trial, and judgment notwithstanding the verdict thereafter, but he is now entitled to a new trial. The plaintiff argues that in this case, the verdict entered was clearly against the manifest weight of the evidence and, moreover, the evidence so overwhelmingly favored the plaintiff that no contrary verdict should have been allowed to stand.

Plaintiff maintains that according to the testimony in this case, the plaintiff clearly established that Louis Barrera was walking on a public walkway, previously installed by the City of Chicago and under the City's control; that while carrying the minor plaintiff, Barrera tripped and fell into a hole created by the City on that sidewalk; that the hole at issue was three to five inches deep and approximately one foot wide; and that when Barrera fell into that hole spraining his own ankle and injuring his knee, he fell on top of the minor plaintiff, snapping the minor plaintiff's leg.

Conversely, the City argues that there are three bases under which the jury could have found in its favor: (1) the jury could have reasonably concluded that the plaintiff's femur fracture did not oc-

cur as a result of a fall on the sidewalk; (2) the jury could have concluded that the sidewalk was reasonably safe; and (3) the jury could have concluded that the City did not have notice of the defect in the sidewalk.

A party is entitled to a judgment notwithstanding the verdict "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) In this case, when all the evidence is viewed in its aspect most favorable to the defendant, it cannot be said that it so overwhelmingly favors plaintiff that no contrary verdict based on the evidence could stand.

■ It is the function of the jury to resolve substantial factual disputes requiring either the assessment of witness' credibility or an election between conflicting evidence. (*Brooks v. City of Chicago* (1982), 106 Ill. App. 3d 459, 464, 435 N.E.2d 1182, 1186.) In this case, there was conflicting testimony by the experts as to the cause of the plaintiff's injury and as to the extent of the injury. Barrera was the only occurrence witness and certainly the issue of his credibility was for the jury to decide. There was testimony by a City employee that the hole did not appear dangerous and that the hole appeared level. In addition, pictures of the alleged accident scene were admitted into evidence. Several pictures of the scene indicated an irregularity in the sidewalk near a curb and in direct line with a sign of some sort. Another picture depicted a hole in the cement with a ruler across it. The ruler indicated that the width of the hole was approximately 22 inches. The hole was filled with what appears to be dirt. Nothing indicated the depth of the hole, if any.

Verdicts and judgments are not considered against the manifest weight of the evidence unless a conclusion opposite to that reached by the jury is clearly evident or the jury's verdict is palpably erroneous. (*Didier v. Jones* (1978), 61 Ill. App. 3d 22, 27, 377 N.E.2d 572, 575.) "Manifest weight" as applied in the determination as to whether a verdict or judgment is against the manifest weight of the evidence is that weight which is clearly evident, plain and indisputable. (*Didier*, 61 Ill. App. 3d at 27, 377 N.E.2d at 575.) Where the assessment of the credibility of the witnesses, or where the evidence demonstrates a substantial factual dispute, or if the determination regarding conflicting evidence may be decisive of the outcome, it is error to enter a judgment notwithstanding the verdict. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082,

1087, 560 N.E.2d 969; *Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 509, 492 N.E.2d 1364.) A reviewing court may not set aside a verdict merely because the jury could have determined the credibility of the witnesses differently or drawn different inferences of fact, and where credible evidence supports the verdict, the reviewing court may not say that the conclusions other than the ones drawn by the jury are more reasonable. (*Didier*, 61 Ill. App. 3d at 27, 377 N.E.2d at 576.) Accordingly, for the reasons set forth above, we find that the trial court properly denied the plaintiff's motion for a judgment notwithstanding the verdict.

A motion for a new trial will be granted if, after weighing the evidence, the trial court determines that the verdict is against the manifest weight of the evidence, *i.e.*, an opposite conclusion is clearly evident or the jury's verdict is palpably erroneous. (*International Meat Co. v. Bockos* (1987), 157 Ill. App. 3d 810, 510 N.E.2d 1013.) It is within the sound discretion of the trial court whether to grant a motion for a new trial, and absent a clear abuse of that discretion, the decision of the trial court will remain undisturbed. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969.) We have reviewed the record, and we find the jury's verdict to have been properly supported by the evidence. Thus, we have no basis to disturb its findings.

We find that the trial court did not err in failing to enter a directed verdict in plaintiff's favor, in failing to enter a judgment notwithstanding the verdict or in failing to grant the plaintiff a new trial.

II

Plaintiff argues that the trial court committed reversible error by allowing Dr. Lelyveld to testify. Due to the plaintiff's motion *in limine*, Dr. Lelyveld was barred from giving testimony that the fractured femur sustained by the plaintiff was due to child abuse and not to the accident at issue. The trial judge allowed Dr. Lelyveld to render an opinion that it was unlikely that the minor plaintiff's injury could have occurred as a result of Barrera tripping into a hole and falling on top of him.

In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, the Illinois Supreme Court adopted Rules 703 and 705 of the Federal Rules of Evidence (Fed. R. Evid. 703, 705) with respect to expert testimony. As a result experts can now render opinions without prior disclosure of the underlying facts or data upon which those

opinions are based. Further, experts can now render opinions based upon certain inadmissible evidence, if such evidence is reasonably relied upon by experts in the field in forming opinions upon the subject.

The Illinois Supreme Court stated in *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 186, 554 N.E.2d 1381:

"We hold that it is for the circuit court, in the exercise of its discretion, to determine whether the underlying facts or data upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field. Such a determination shall not be disturbed unless there has been an abuse of discretion.

The opinion of an expert that the underlying facts or data upon which he or she seeks to base an opinion are of a type reasonably relied upon by experts in the particular field is a factor to be considered by a circuit court in the exercise of its discretion. This, however, does not allow the circuit court to 'abdicate its independent responsibilities to decide if the bases meet minimum standards of reliability as a condition of admissibility.' [Citation.]

The reason for the substantive inadmissibility of the facts or data upon which an expert relies must be considered by the circuit court. If another rule of law applicable to the case excludes the information sought to be relied upon by the expert, the information may not be permitted to come before the jury under the guise of a basis for the opinion of the expert."

A trial judge need not allow an expert to state the underlying facts or data of his opinion "when [their] probative value in explaining the expert's opinion pales beside [their] likely prejudicial impact or its tendency to create confusion." (*People v. Anderson* (1986), 113 Ill. 2d 1, 12, 495 N.E.2d 485.) An expert may testify to what might or could have caused an injury despite any objection that the testimony is inconclusive or speculative. The expert's testimony is but the opinion of the witness given on facts assumed to be true; it is the function of the trier of fact to determine the facts. *Beloit Foundry v. Industrial Comm'n* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504; *Mesick v. Johnson* (1986), 141 Ill. App. 3d 195, 490 N.E.2d 20.

Plaintiff argues that allowing Dr. Lelyveld to speculate to the jury that something other than the accident at issue caused Phillip's injury created a highly prejudicial inference with nothing in the rec-

ord to support it outside of Dr. Lelyveld's impermissible assumptions. Plaintiff maintains that Dr. Lelyveld gave an opinion which has no basis in the record because all of the testimony presented indicated that Barrera was walking down the street and tripped and fell in a hole, landing on top of Phillip.

■ Dr. Lelyveld's credentials as an expert were not questioned. Dr. Lelyveld testified that he reviewed Phillip's hospital records, including X rays, Barrera's statement and Barrera's deposition. Dr. Lelyveld testified that in his opinion Barrera would have suffered injuries had the accident occurred in the manner in which he testified. Plaintiff maintains that uncontroverted testimony confirmed that, in fact, Barrera had a sore ankle, as well as torn pants and a bloody knee, and thus, Dr. Lelyveld should not have been allowed to contradict facts in evidence based upon his own personal speculation.

Plaintiff cites *Royal Elm Nursing & Convalescent Center, Inc. v. Northern Illinois Gas Co.* (1988), 172 Ill. App. 3d 74, 526 N.E.2d 376, to support his contention that although the existence of a fact may be inferred from the evidence, an expert, no matter how skilled or experienced, is not permitted to state an opinion based on conjecture or give a conclusion which is not only unsupported by the evidence but specifically contradicted by it. Barrera testified that he had injured his knee and ankle, that he accompanied the plaintiff to the hospital, and that his ankle still bothered him at the time of trial; however, he also testified that at no time did he ever seek medical attention for these injuries. Gloria Aguinaga testified that she did not recall seeing scratches on Barrera or his limping after the accident. We do not believe that the evidence that Barrera was injured remains uncontradicted by all the evidence. Moreover, Dr. Lelyveld indicated that his opinion was based on his review of Phillip's medical records, Barrera's statement and his experience.

The City maintains that Dr. Lelyveld's testimony was highly relevant to a central issue in the case; whether the plaintiff's injury was in fact caused by a fall on the sidewalk. The City cites the following from *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 241, 529 N.E.2d 525:

> "Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable. [Citation.] Each party is entitled to present evidence which is relevant to its theory of the case, as well as evidence which shows conduct inconsistent with an opponent's theory."

We find that the trial court properly allowed Dr. Lelyveld's testimony and that said testimony was properly limited to exclude any reference to child abuse as that testimony's prejudicial effect would have outweighed its probative value.

### III

Plaintiff argues that the trial court committed reversible error in allowing the defendant to cross-examine the plaintiff's treating physician as though he were an expert witness hired by the plaintiff. Plaintiff maintains that the cross-examination of Dr. Treister surpassed what was allowable of a treating physician, specifically asserting that the court allowed the defendant to cross-examine Dr. Treister on the number of times he had testified in court generally since the year 1988, despite the fact that none of those times were at the behest of the plaintiff's attorney in the present case; that 10% of the time in his office is spent consulting generally as an expert witness on plaintiffs' cases, although he had never consulted with plaintiff's attorney on this case as an expert witness; that he had given approximately 80 to 90 depositions a year in personal injury matters; and that he had made more than $100,000 per year testifying in a general capacity as an expert witness. Plaintiff argues that the defendant's inquiries into Dr. Treister's consulting activities unrelated to this lawsuit were designed for the sole purpose of impugning Dr. Treister's integrity just because he happens to testify in other unrelated matters as an expert witness.

Both Dr. Treister and Tina Chavez testified that Phillip had been referred to Dr. Treister through St. Elizabeth's Hospital. Dr. Treister also stated that he had never testified on behalf of plaintiff's counsel prior to the present case.

In *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 411, 466 N.E.2d 210, the Illinois Supreme Court held that the trial court had abused its discretion when it refused to allow defense counsel to cross-examine the plaintiff's medical expert, who was also a treating physician, concerning the number and frequency of patient referrals from the plaintiff's attorney. In that case the patient was referred by the attorney. The Illinois Supreme Court stated: "Each trial involves a search for the truth, and we believe that this search is facilitated by the opportunity to weigh the credibility of each witness." (*Sears*, 102 Ill. 2d at 409, 466 N.E.2d at 214; see also *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) The court noted that it was not suggesting that anything was improper in the relationship between the plaintiff's attorney and the doctor; how-

ever, the court felt that the jury is in the best position to make a decision and an informed decision is impossible if defense counsel is not allowed to probe this subject on cross-examination.

In *Trower v. Jones* (1988), 121 Ill. 2d 211, 222, 520 N.E.2d 297, 302, the Illinois Supreme Court held that the trial court did not abuse its discretion in permitting defense counsel to cross-examine the plaintiff's expert witness "regarding (1) the annual income derived from services relating to serving as an expert witness and (2) the frequency with which the witness' testimony in prior cases had been for 'people suing doctors.' " The *Trower* court also stated:

> "As this case helps illustrate, many experts today spend so much of their time testifying throughout the country that they might be deemed not only experts in their field but also experts in the art of being a persuasive witness and in the art of handling cross-examination. As was stated in *Kemeny v. Skorch*, 22 Ill. App. 2d 160[, 159 N.E.2d 489], little has the nonlitigating public (including the jury) realized the 'true rhetorical masterpieces that came from the lips of medical experts.' " (*Trower*, 121 Ill. 2d at 216, 520 N.E.2d at 299, quoting *Kemeny v. Skorch* (1959), 22 Ill. App. 2d at 171.)

The court further noted: "We have long recognized that the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship or financial interest." *Trower*, 121 Ill. 2d at 217, 520 N.E.2d at 300, citing *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 407, 466 N.E.2d 210; *Chicago City Ry. Co. v. Handy* (1904), 208 Ill. 81, 69 N.E. 917.

Recently the court in *Kim v. Evanston Hospital* (1992), 240 Ill. App. 3d 881, 890, stated the following:

> "Treating physicians may render their professional opinions, including opinions regarding the applicable standard of care, even though they have not been disclosed as experts. [Citation.] Therefore, it logically follows that an opposing party should have the same ability to cross-examine a treating physician that he would have in cross-examining a retained expert. A party may properly cross-examine a medical expert regarding fee arrangements, prior testimony for the same party, and financial interest in the outcome of the case."

The court held that counsel must be given the widest latitude to demonstrate any interest or bias of an expert through cross-examination. See *Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309 (no error occurred when defendant's counsel

asked the witnesses whether they had ever before testified in a case for plaintiff's counsel).

██ In the present case, Dr. Treister was questioned regarding his consulting activities; however, he also testified that he had never before testified for the plaintiff's attorney and that the plaintiff was referred to him through a hospital referral service. We do not suggest that there is anything improper with the fact that Dr. Treister has testified in the past as an expert witness. However, we do feel that this information does show his familiarity with a courtroom and potential to be a very persuasive witness. Accordingly, we do not find that the City committed reversible error in its cross-examination of Dr. Treister.

IV

Plaintiff argues that the trial court committed reversible error in precluding the plaintiff from submitting evidence of the City's policies and procedures regarding the repair and inspection of City sidewalks. The plaintiff maintains that in order to have sustained his burden of proof in this case he had to prove that the City had actual or constructive notice of the unreasonably dangerous condition at issue. (See Ill. Rev. Stat. 1983, ch. 85, par. 3—102.) Plaintiff contends that plaintiff could have shown, and did, that the hole at issue existed long enough to constitute constructive notice as a matter of law. (See *Baker v. City of Granite City* (1979), 75 Ill. App. 3d 157, 394 N.E.2d 33; *Livings v. City of Chicago* (1975), 26 Ill. App. 3d 850, 326 N.E.2d 170.) However, plaintiff also asserts that he could have also shown that the City's standard operating procedures regarding the repair and inspection of public sidewalks reflected its failure to act with reasonable care and diligence, again establishing constructive notice.

The fact that there may be sufficient evidence to support a verdict for the plaintiff on one theory does not warrant the refusal of evidence on another theory. (See *Underwood v. Pennsylvania R.R. Co.* (1966), 34 Ill. 2d 367, 215 N.E.2d 236.) Accordingly, plaintiff contends that his inability to present all the evidence in his possession relating to the City's repair and inspection procedures was highly prejudicial to the plaintiff's case.

Plaintiff argues that his evidence attesting to the City's policies and procedures for the repair and inspection of City sidewalks not only substantiated plaintiff's claim of constructive notice but also constituted circumstantial evidence establishing actual notice. Plaintiff cites as an example the fact that the City admittedly retained

no documentation regarding the creation of the hole in question when it removed the tree from in front of William Kurnat's house. Jerry Dalton, a City employee with the department of forestry, testified that it was the City's responsibility to remove problematic trees and tree stumps. Plaintiff asserts that from this point, he could have established, through the testimony of Robert Callbeck, that it was the City's general practice to receive notification from the department of forestry of holes which required cement filling as a result of tree removal so that the department of streets and sanitation could then proceed to fix whatever hole was left behind. The plaintiff maintains that when the trial court precluded Callbeck's testimony in this regard, he was prevented from establishing circumstantially that the City would have received actual notice of the defect at issue, presuming its regular policies and procedures had been followed. Thus plaintiff argues he is clearly entitled to a new trial in this cause.

Prior to trial, the City presented a motion *in limine* to exclude evidence of City policies regarding the repair of sidewalks. At the hearing on the motion the City indicated that during Mr. Callbeck's deposition, plaintiff's counsel "went into great length about under what circumstances would the City decide to repair a sidewalk, how they would go about doing it and that kind of thing." The City argued that it was not the City's policies that were on trial, but rather the question was simply, was this a reasonably safe sidewalk and did the City know about it. The trial judge stated that he agreed and granted the motion.

In determining whether evidence is relevant, the trial court must consider the evidence in light of the factual issues raised by the pleadings, and it is not error to exclude testimony which does not bear on the specific issues under consideration. (*Schneiderman v. Kahalnik* (1992), 200 Ill. App. 3d 629, 635-36, 558 N.E.2d 334.) A trial court's determination as to what is relevant is largely within the discretion of the trial court and reversal of its decision is not warranted absent an abuse of that discretion. (*Schneiderman*, 200 Ill. App. 3d at 635-36, 558 N.E. 2d 334.) Plaintiff asserts, in order to sustain his burden of proof in this case, he needed to prove that: (1) Barrera was permissibly using the public walkway where the accident occurred; (2) the sidewalk was not reasonably safe; (3) Barrera fell into that hole while holding the minor plaintiff, who thereby sustained injury; and (4) the City had actual or constructive notice of the existence of the hole. Mr. Kurnat testified that a tree was removed from the front of his house. Mr. Dalton testified that

when the department of forestry removes a tree stump, it backfills the hole and does not contact another department within the City. The trial court ruled that evidence of the circumstances under which the City determines that it will repair a sidewalk was not relevant to any of the issues necessary to prove the plaintiff's cause of action. We do not find that the trial court abused its discretion in this determination.

Prior to the commencement of the trial, the City answered interrogatories stating that it had no system of sidewalk inspection. The City filed a motion *in limine* to exclude evidence of the City's lack of an inspection system which the trial court denied. On the third day of trial, plaintiff's counsel asserted in the judge's chambers that he had recently learned that the City had previously had a policy of inspecting every inch of City sidewalks once a year. The City maintains that the plaintiff has waived the issue regarding an inspection system because he never made an offer of proof. The following is the relevant portion of the transcript:

"MR. POWER [Plaintiff's counsel]: Judge, it was brought to my attention last night that the City, for a number of years, did employ Inspectional Services for their city sidewalks.

THE COURT: I'm not going to go into that, Mr. Power.

MR. POWER: Judge—

THE COURT: I've tried about thirty-five, forty fall down cases. We don't go into that.

MR. POWER: They won't be to put [*sic*] anyone on regarding notice here.

MS. MCDONALD: [Defense counsel]: We're not going to.

THE COURT: Are you going to call anybody from the Mayor's office—

MS. MCDONALD: We're not going to.

THE COURT: I guess they're not.

You had two witnesses testify of that actual constructive notice for the City.

MR. POWER: I still think it's relevant.

THE COURT: It's not relevant. If I let that stuff go in here, we'll back up the system a little bit further than it is already backed up.

What else do we have?

MR. KOPOULOS [Plaintiff's counsel]: We're sorry for the request. The reason for the request—

THE COURT: I know the reason for the request. I've been sitting here for over ten years.

MR. KOPOULOS: The development that we has last night, there was a motion by the City in limine at that time denied by you.

THE COURT: You are going to have to come back another avenue from coming back around that.

MR. KOPOULOS: You denied their motion regarding inspection of city sidewalks. We've learned at that time, and perhaps counsel was under the impression, but at that time you'd asked is there any inspection of city sidewalks and they indicated to you that there was not.

However, we've learned that there is. There is a routine inspection of city sidewalks and there has been for many years. There is an inspector, we know his name that is in charge—

THE COURT: If there is an inspectional service for the City of Chicago and it hasn't operated for many years—

MR. KOPOULOS: Maybe, Your Honor—

MS. MCDONALD: That would be totally a surprise for me.

MR. POWER: I'll have transcripts delivered here today to show it was operated at least in '82 and possibly '83.

THE COURT: I have a neighbor that fell down ten years ago because of the city sidewalk, and it's still the same way. They don't do anything about anything.

MR. KOUPOLOS: They allege and they say that they inspect every inch of city sidewalk once a year.

THE COURT: I can take judicial notice that they don't. It's denied.

MR. KOPOULOS: Thirteen times they missed this hole."

In addition plaintiff maintains that the trial court had previously indicated that offers of proof were no longer required by the appellate courts and consequently no offers of proof were going to be allowed during the course of the trial. The City maintains that this contention is incorrect and that the conversation referred to by the plaintiff occurred when the judge denied the City leave to make an oral offer of proof. The following discussion was had when the City attempted to present its offer of proof:

"MS. MCDONALD: What I want to bring up was I need to do my offer of proof on Dr. Lelyveld. I was wondering if we should do that before the jury is coming back.

THE COURT: You don't have to do that. All you have to do for an offer of proof is state it on the record.

MS. MCDONALD: I want to do it. I think it will be a lot more effective.

THE COURT: It's not necessary. Read the Law.

MS. MCDONALD: I'm not saying it's necessary. I'm not disagreeing with your Honor. For purposes of our appeal, we would like to do it that way because it would be a lot more effective for the Appellate Court to see what Dr. Lelyveld would have said.

THE COURT: I don't think it's necessary. They have changed the law. The reason they changed the law is to move these trials along because of the backlog.

MS. MCDONALD: It's not going to be terribly long.

MR. KELLY: Can we read his deposition into the record?

THE COURT: Better than that, file it with the clerk.

MR. KOPOULOS: It was attached to the motion.

MR. KELLY: Can we then spend at least ten minutes making our offer by paraphrasing his testimony?

THE COURT: Paraphrase it and file it with the dep. After they change the law, we are supposed to pick up on it after they change the rules.

MR. KELLY: We have to make his offer of proof.

THE COURT: I understand this is the way we do it.

MR. POWER: I don't know that they have to paraphrase it. It is what it is.

THE COURT: They can do what they want. The motion in limine addresses that."

The trial court allowed the City to file a written offer of proof as well as Dr. Lelyveld's deposition. The City argues that the court allowed the City to make a written offer of proof and there is no reason the plaintiff could not have done the same.

The Illinois Supreme Court recently stated in *People v. Andrews* (1992), 146 Ill. 2d 413, 420-21, 588 N.E.2d 1126:

"It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. [Citations.] The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper. [Citation.] The failure to make an adequate offer of proof results in a waiver of the issue on appeal. [Citations.]

Where an objection is sustained to the offered testimony of a witness, an adequate offer of proof is made if counsel makes known to the trial court, with particularity, the substance of the witness' anticipated answer. [Citation.] An offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate. [Citation.] Neither will the unsupported speculation of counsel as to what the witness would say suffice. [Citation.] Rather, in making the offer of proof, counsel must explicitly state what the excluded testimony would reveal and may not merely allude to what might be divulged by the testimony. [Citation.] The offer serves no purpose if it does not demonstrate, both to the trial court and to reviewing courts, the admissibility of the testimony which was foreclosed by the sustained objection. [Citation.]"

We disagree with plaintiff's contention that the trial court precluded offers of proof entirely. However, we do find that the trial court's interpretation as to what is necessary for a proper offer of proof is clearly erroneous. See *Andrews*, 146 Ill. 2d at 420-21, 588 N.E.2d 1126.

The City argues that even at this late date, the plaintiff has not attempted to show what evidence he would have adduced in support of his claim that City sidewalks were inspected annually, and at a minimum, the plaintiff should have attached an offer of proof to his post-trial motion. The City maintains that since the record does not reflect what evidence the plaintiff proposed to introduce, it is impossible to say whether the exclusion of that evidence was proper and, thus, the plaintiff has waived the issue. In reply, plaintiff contends he did not waive the issue and points to the fact that while on trial it was brought to his attention that an inspection system for City sidewalks existed and in addition he identified Mr. Daniel Marzovillo as at least one person employed by the City of Chicago responsible for sidewalk inspections. Plaintiff also maintains that he requested that Mr. Marzovillo be produced for examination during trial and that all relevant documents regarding inspection of the subject sidewalk be produced. The aforementioned excerpt from the transcript does not refer to Mr. Marzovillo by name; however, plaintiff's counsel did indicate that there was an inspector and she had his name. A notice to produce Mr. Marzovillo and all relevant documents regarding inspection of the sidewalk at trial is contained in the appendix to plaintiff's brief; however, that copy does not indicate that it was ever filed with the court and we were unable to find a copy of this pleading in the record. Plaintiff maintains that

under the circumstances of the case, it is preposterous to allow the defendant to argue waiver as it was not possible to have made a more detailed offer of proof having been prevented from discovering the very information which would be required to do so.

■■ As stated above, even though the trial court was mistaken as to the specificity that is required for a proper offer of proof, we do not believe that the trial court precluded offers of proof altogether. However, where the attitude of the trial court is such as to prevent a party from presenting offers of proof, none are necessary in order to preserve for review the court's rulings which exclude evidence. (*Goad v. Evans* (1989), 191 Ill. App. 3d 283, 299, 547 N.E.2d 690.) Reading the transcript, it appears that the plaintiff was attempting to make an offer of proof and that the trial court continued to cut him off. We note the plaintiff never specifically stated that he was attempting to make an offer of proof, although it was obvious that he was attempting to inform the trial court of the nature of the evidence he wished to present. In light of the trial court's comments that "all you have to do *** is state it on the record" and that "[t]hey have changed the law," we cannot hold that the plaintiff has waived the issue for failure to provide an offer of proof. Nevertheless, in the present case we find any error in the exclusion of the evidence to be harmless.

The admission of evidence, even cumulative evidence, is a matter committed to the sound discretion of the trial court. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.*(1991), 217 Ill. App. 3d 94, 108, 576 N.E.2d 918; *Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 685, 455 N.E.2d 232.) The trial court's determination of admissibility is based upon a balance of the probative value and the prejudicial effect of the proffered evidence and absent a clear showing of an abuse of the trial court's discretion in admitting certain evidence, its determination will remain undisturbed. (*Jae Boon Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 461, 605 N.E.2d 403.) When the plaintiff sought to have the information regarding the City's inspection policies introduced, the trial court indicated that the plaintiff already had two witnesses testify as to actual constructive notice for the City. The trial court also indicated that it felt the information was not relevant. We do not believe that the trial court abused its discretion in precluding this information. Moreover, the evidence of an inspection system would be cumulative in light of the testimony that the hole had been in existence for a long period of time.

The admission of cumulative evidence is within the discretion of the trial judge. (*Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 502 N.E.2d 315.) The exclusion of evidence is harmless where the evidence excluded was fully established by other evidence and also where the evidence offered was merely cumulative. (*Chuhak v. Chicago Transit Authority* (1987), 152 Ill. App. 3d 480, 486, 504 N.E.2d 875.) In light of the evidence presented in this case as to the City's constructive notice of the sidewalk defect, we find that the exclusion of the evidence regarding any sidewalk inspection system for the purpose of proving the City's notice of the defect was harmless error as the evidence would have been cumulative.

█ Finally, we note, although any resident of the City might find it difficult to believe that the City inspects every inch of the sidewalk, it was still error for the trial court to state that it could take judicial notice that the City does not inspect every inch of City sidewalk once a year. However, the comment was made outside the presence of the jury and we find that the error was harmless.

## V

Plaintiff argues that the court committed reversible error in the submission of certain jury instructions over plaintiff's objection. Plaintiff argues that the trial court erred in giving, over objection of the plaintiff, defendant's instruction No. 7, which provided as follows:

> "The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement or acted in a manner inconsistent with the testimony of the witness in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness."

Plaintiff asserts that the credibility of Barrera was pivotal to the plaintiff's case and when the trial court allowed improper impeachment, and wrongfully instructed the jury on its effect, an innuendo was created which was so highly prejudicial to the plaintiff that it clearly deprived the plaintiff of a fair trial.

█ On cross-examination, Barrera testified that although he and Phillip were the only people on the sidewalk, he was walking close to the curb. When asked if he was walking directly towards a sign, so that if he hadn't tripped he would have walked into the

sign, Barrera replied that he didn't recall the sign. Defense counsel then read from Barrera's deposition in the case wherein the following colloquy took place: "Question: was this pole here on the date of the accident. Answer: Of course." Barrera was also asked whether he was paying attention to where he was walking when the accident occurred, to which Barrera replied, he didn't recall. Defense counsel then asked if he ever made a statement that he was not paying attention when he was carrying Phillip to which Barrera replied, "No." Defense counsel then read from Barrera's deposition wherein Barrera had stated that he was not paying attention when he was walking down the block. Defense counsel also attempted to impeach Barrera with the following after Barrera was asked if he ever made a statement that he did not go to the hospital with Phillip:

"Q. Mr. Barrera, were you asked these questions and did you give these answers: 'Question: did you take—' I'm starting on Page 63, Line 24. 'Did you take Phillip to the doctor: No, I think she called Tina to come over or something and we took him to the hospital. Question: So his grandmother called Tina? I guess that's how it was. Question: Okay. You didn't go to the doctor with him. Answer: No, I didn't.' "

Barrera then stated that he didn't go to the doctor, he went to the hospital. Barrera stated that he sprained his ankle and he was limping and although he went to the hospital, he never got any medical treatment for the sprained ankle. The ankle still bothers him today. Plaintiff's counsel objected that the testimony was not impeaching and the trial court indicated that it was for the jury to determine whether the information was impeaching when he gave them a proper instruction.

Finally, we note, the above instruction did not relate only to Barrera. Defense counsel attempted to impeach Tina Chavez and Phillip Aguinaga, while plaintiff's counsel attempted to impeach Dr. Gonzalez. We find no error in the above instruction.

■■ Plaintiff also argues that the trial court erred in giving, over plaintiff's objection, defendant's instruction No. 11, which provided as follows:

"If you decide that defendant was negligent and that its negligence was a proximate cause of the injury to the Plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame. However, if you decide that the sole proximate cause of injury to the plaintiff was

the conduct of some person other than the defendant, then your verdict should be for the defendant."

The defendant argues that under the circumstances of this case, this instruction was clearly improper and highly prejudicial. Plaintiff argues that an instruction on sole proximate cause should only be given if a circumstance existed where the defendant could have been found to bear no responsibility for the occurrence in question. (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373.) However, a particular jury instruction given by the trial court is proper if it is supported by some evidence in the record, and the trial court has discretion in deciding which issues are raised by the evidence. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1087, 560 N.E.2d 969.) The City's theory of the case appears to have been that Phillip's injury was due solely to Barrera's negligence or that the injury was caused by some event other than Barrera's fall. Accordingly, we find that the trial court did not err in giving the instruction.

Moreover, in order to raise an issue on appeal concerning the giving of or failure to give a jury instruction, the appellant must provide the reviewing court with the content of the instruction conference establishing that the appellant raised that argument at the instruction conference that he advances on appeal or else he is barred from raising it on appeal. (*Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 350, 415 N.E.2d 337.) The following colloquy is an excerpt from the instruction conference.

"THE COURT: All right? You got the Defendant's, then?

MR. KELLY [Defense Counsel]: Yes, Judge. Judge, you want the clean copies, right?

THE COURT: I want a clean copy and a Court's copy.

MR. KELLY: City's instruction No. 11 which is the credibility of the witness instruction.

THE COURT: And we have one in here?

MR. KELLY: No, sir. That was objected to.

THE COURT: All right. This will be given over Plaintiff's objection. I'm making this Defendant's 11.

MR. KELLY: I'm sorry, Defendant's No. 7.

THE COURT: Okay.

MR. KELLY: Judge, I need to make you a clean copy.

THE COURT: Give me an original and a copy.

MS. McDONALD [Defense Counsel]: We don't have an original that's clean right now. I wrote on the original, I apologize. This is City's No. 11 which is 12.05.

THE COURT: You objecting? Are you objecting to this? This is City's 11, Defendant's 11.

MR. KOPOULOS [Plaintiff's counsel]: That 12.05? Yes, Your Honor.

MS. McDONALD: Let me just say we would have put breach of duty but in light of your ruling we'll put negligent.

THE COURT: It will be given over Plaintiff's objection, Defendant's 11 as revised.

MR. KOPOULOS: Correct, Your Honor.

MR. KELLY: No, it doesn't need to be revised.

THE COURT: I need an original."

If a party believes that the jury instructions used in a case are incorrect, incomplete or otherwise inadequate, it is his duty to object by specifying the defects claimed and by offering his own remedial version of the instructions, stating the law for which he argues. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 202-03, 537 N.E.2d 267; *Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 387, 385 N.E.2d 664; see also 134 Ill. 2d 239(b).) Moreover, failure to object to the instructions given and failure to tender a correct instruction results in a waiver of the issues on appeal. (*Deal*, 127 Ill. 2d at 203.) In the present case, although plaintiff's counsel did object to the two jury instructions in question, counsel failed to make a specific objection as to the defect and failed to offer remedial versions of the instructions. Thus, if there was any error in tendering the above instructions to the jury, the plaintiff has waived the issue.

Accordingly, for all the reasons set forth above, we affirm the decision of the trial court.

Judgment affirmed.

GORDON, P.J., and COUSINS, J., concur.