FOURTH DIVISION
 FEBRUARY 27, 1997











No. 1--95--1652

ROSEMARY DUPREE, Special Administrator
on behalf of the Estate of Christopher
Hunter, Deceased,

 Plaintiff-Appellant,

 v.

COUNTY OF COOK,

 Defendant-Appellee.)
)
)
)
)
)
)
)
)
)
)Appeal from the
Circuit Court of
Cook County

No. 90--L--7583

Honorable
Walter Bieschke,
Judge Presiding.


 JUSTICE CERDA delivered the opinion of the court:
 This is a medical malpractice case in which plaintiff, Rosemary
Dupree, Special Administrator of the Estate of Christopher Hunter,
alleged that a proximate cause of Christopher's death was the failure
of defendant, Cook County, to correctly diagnose that he was
physically abused by his mother, Mildred Hunter, and to report that
abuse. Plaintiff's fourth amended complaint alleged that defendant:
(1) carelessly and negligently failed to properly interpret a CT
scan; (2) carelessly and negligently allowed a resident to interpret
a CT scan without being reviewed by the attending radiologist and
attending physician; (3) carelessly and negligently discharged
Christopher without a proper evaluation of the CT scan; and (4)
carelessly and negligently discharged Christopher to his mother's
care without notifying the Department of Children and Family Services
(DCFS) of a fractured skull and subdural hematomas.
 Following a jury verdict in favor of defendant, plaintiff
appealed. On appeal, plaintiff asserts that the trial court erred in
not striking the expert testimony of Dr. Byrd, whose opinions were
not based on evidence, and abused its discretion (1) in denying her
motion for a mistrial based on defense counsel's repeated violation
of in limine orders and other misconduct; (2) in denying her motion
for a new trial based on the same misconduct by defense counsel; (3)
in barring her expert witness, Dr. Liza Squires, as a Supreme Court
Rule 220 sanction (134 Ill. 2d R. 220); and (4) in denying her motion
for a new trial since the jury verdict was contrary to the manifest
weight of the evidence. For the following reasons, we affirm.
 Christopher was born on December 29, 1986. On March 2, 1987, he
was admitted to Cook County Hospital, where he underwent a CT scan of
his brain. Defendant misread the March 6, 1987, CT scan as normal
and failed to diagnose the bilateral subdural hematoma and skull
fracture that were present. DCFS was not notified, and on March 9,
1987, Christopher was discharged to his mother, who was instructed to
bring him to the High Risk Clinic for a follow-up visit at 12:30 p.m.
on March 16, 1987. She failed to do so, and on July 3, 1987,
Christopher was admitted to Cook County Hospital, where he was
diagnosed with hydrocephalus, commonly known as water on the brain. 
The attending pediatrics physician, Dr. Demetra Soter, viewed
Christopher's March 6th CT scan and determined that it was abnormal. 
It showed a bilateral subdural hematoma and a skull fracture. After
Christopher was discharged from the hospital in July 1987, he was
placed in foster care and died on May 16, 1988.
 Following opening statements, plaintiff moved for a mistrial
based on defendant's statements that plaintiff's expert witness, Dr.
Marshall Salkin, was paid to review cases and that Mildred Hunter
shook Christopher in anger for 15 minutes. The motion was denied.
 Dr. Demetra Soter, a child abuse expert, testified as an adverse
witness. She stated that she was one of the pediatricians who
treated Christopher when he was admitted to the hospital's pediatric
intensive care unit on July 3, 1987, in critical condition. At that
time, Christopher was skinny and very, very small, and his head was
the size of a small watermelon. He was blind, deaf, and severely
brain-damaged. He could not turn his head, roll over, or sit up. 
After she diagnosed Christopher with hydrocephalus, a shunt was
immediately placed in his head to drain the fluid. When Dr. Soter
reviewed the records from Christopher's March 2, 1987,
hospitalization, she found no indication that Christopher had been
blind, deaf, or brain-damaged at that time. His symptoms were
seizures, sleepiness, and lethargy, but his head was not big. 
 Dr. Soter's opinion was that a radiology resident had misread
the March CT scan as normal when it was abnormal. It showed subdural
hematomas, or hemorrhages, and a skull fracture. In contrast, the
July 1987 CT scan of Christopher's brain indicated that there was an
excessive build-up of brain fluid and very little brain remaining. 
Dr. Soter explained that the excess fluid, not the subdural
hematomas, destroyed the brain by compressing it, which resulted from
the lack of medical care after March 1987. 
 If the CT scan had been properly read and interpreted in March
1987, Dr. Soter thought that DCFS would have been notified of
possible child abuse. She did not know, however, what DCFS would
have done because some children with skull fractures go home. If
DCFS had followed-up with medical care, Christopher would probably
have lived, but would have been brain-damaged. Proper follow-up of
Christopher's condition would have included frequent observation of
the size of his head, which would have controlled the size and
condition of his head. Dr. Soter believed that there was evidence of
further abuse after Christopher's March discharge from the hospital
since small subdurals usually do not worsen unless there is
additional abuse.
 On cross-examination, Dr. Soter explained that shaken baby
syndrome exists where children under one or two years of age are
shaken with enough severity that the brain goes in the opposite
direction from the skull, tearing vessels between the brain and
skull. This causes bleeding on the brain's surface, which are called
subdural hematomas. On the outside, the child will look normal, but
there will be neurological changes, such as lethargy.
 In Dr. Soter's opinion, death was not caused by the CT scan
being misread in March because the subdural hematomas and skull
fracture were not the cause of death. The cause of death was
hydrocephalus caused by Hunter's failure to follow-up Christopher's
care after his March discharge, which led to the fluid building up
inside Christopher's brain. 
 John Friedman, the DCFS social worker who was assigned to
Christopher's case in July 1987, testified that there had been no
DCFS contact with Christopher's family prior to July 1987. Friedman
took Christopher's case to court because of the medical records and
the statement by Christopher's grandmother, Rosemary Dupree, who had
been living with Christopher and his mother. Dupree told him that
the abuse and neglect by Christopher's mother had been ongoing. 
Friedman testified that he probably would have sought to have
Christopher removed from his home in March 1987 if he had known about
the skull fracture and had been told that Hunter had caused it. 
 Friedman explained that physicians and health care workers are
required by statute to notify DCFS when a three-month-old infant is
admitted to the hospital with a skull fracture if abuse or neglect
are suspected. When DCFS finds serious injuries on a child, such as
a skull fracture, it makes inquiries with the doctors, hospital,
family, and neighbors. If there is a determination that the child is
not safe at home, DCFS normally removes the child from the home. If,
however, there is no evidence of child abuse, Friedman would be
suspicious and would investigate, but would not necessarily take the
child from the home. He had no opinion about whether DCFS would have
taken Christopher from his home in March 1987 if Friedman had known
of the fracture and subdural hematoma, but did not know about any
prior child abuse. 
 Dr. Marshall Salkin, an emergency room physician, testified as
plaintiff's expert witness. It was Dr. Salkin's opinion that
defendant deviated from the standard of care when the resident and
attending physician misread the CT scan; when the attending physician
allowed the resident to make a final diagnosis instead of reading the
CT scan himself; and when the attending physician discharged
Christopher without an official radiology report or CT scan reading
in his chart. Dr. Salkin considered the breaches a contributing
cause of Christopher's death on the ground that his injuries were not
irreparable when he was discharged in March 1987. Even though Dr.
Salkin agreed that Christopher was a victim of shaken baby syndrome,
he did not consider Christopher's injuries irreparable because Dr.
Ravindranath, who was the attending physician in March, said that
Christopher was continually improving during his hospitalization. 
 It was Dr. Salkin's opinion that the improper discharge caused a
lack of DCFS involvement, which resulted in the lack of follow-up
care, which caused irreparable brain damage prior to July 1987. He
was convinced that Christopher would still be alive if the CT scan
had been read properly and DCFS had been notified because he thought
that the brain damage could have been abated by prompt treatment
following the March hospitalization. He believed that DCFS would
have taken Christopher from his home and placed him in foster care,
thus ensuring adequate follow-up care. 
 Linda Barstatis, Christopher's foster mother, testified about
Christopher's care after he was discharged from the hospital in July
1987. Several times, defense counsel tried to question Barstatis
about DCFS's policy on parents visiting their children in foster
care, but the trial court sustained plaintiff's objection, struck the
defense counsel's statement that her questions went to the damages
issue, admonished the jury to disregard her statement, and warned
counsel to "[s]tay away from that area." 
 Defense counsel then asked Barstatis if anyone from
Christopher's family tried to contact her while Christopher was
living with her. The trial court sustained plaintiff's objection,
stating:
 "Counsel, it has no relevancy with regard to the issues in
 this case as far as the mother's actions are concerned.
 With regard to damages, she is not a taker should this
 jury award any compensation at all to the estate, so her
 conduct on the premises in that regard once the child is in
 the foster home, whatever efforts, if any, she made or what
 the reason may or may not have been something that would be
 inappropriate and I am excluding it by virtue of my ruling.
 I have sustained the objection four or five times
 now."
 Several questions later, defense counsel tried to ask whether
Christopher's family contacted Barstatis regarding his death. The
trial court sustained plaintiff's objection and again admonished
defendant's attorney. 
 On re-direct examination, defendant's attorney attempted to ask
Barstatis about Christopher's life expectancy. Plaintiff's
objections were sustained.
 Following Barstatis's testimony, plaintiff moved for a mistrial. 
The court admonished defense counsel about her persistent questioning
of Barstatis on an improper subject despite being told to avoid that
subject. However, the court denied the motion for mistrial on the
basis that it had explained its ruling to the jury, who did not hear
the answer to the questions.
 Dr. Thyyar Ravindranath, the attending physician during
Christopher's March admission, testified that he vaguely remembered
Christopher and relied heavily on the hospital chart for his
testimony. After being told by one of his residents that
Christopher's CT scan was normal, Dr. Ravindranath discharged
Christopher since his condition was improving. Dr. Ravindranath did
not remember reading the CT scan, but a note written in the chart by
the resident stated that the CT scan had been reviewed. 
 Dr. Ravindranath stated that the hospital's protective services
team was involved in Christopher's case. Unaware of the hematomas or
skull fracture, it decided that Christopher could be returned to his
mother with an appointment for a follow-up visit. If the team had
known the full extent of Christopher's injuries, Dr. Ravindranath
admitted that they would have investigated further and may have
notified DCFS. 
 Mildred Hunter testified that the first time she took
Christopher to the hospital was for a cold. The second hospital
admission occurred after she accidently dropped Christopher, then
picked him up and shook him for three to five minutes. Six or seven
days later, she took him to the hospital because he was not acting
normally and was not taking his bottle. She never noticed that his
head was swollen. At the hospital, she did not tell anyone about the
dropping and shaking incident because no one asked. Hunter denied
that she was ever told to take Christopher to the clinic following
his discharge.

 Latonya Hunter, one of Christopher's sisters, testified that she
was eight or nine years old when she lived with Christopher. She
played with him and gave him his bottle occasionally. On cross-
examination, Latonya stated that she did not know how her brother
died. When defense counsel asked, "Where is your mother today?" the
trial court sustained the objection, then heard plaintiff's motion
for a mistrial out of the jury's presence. Plaintiff argued that
defense counsel repeatedly questioned the witnesses after being
admonished not to ask specific questions, screamed at plaintiff's
attorney several times, smirked, and laughed. The court stated that
the question about Hunter "was grossly out of line" and was harmful,
but it would consider the extent of the harm. After admonishing
defense counsel to refrain from showing her emotions with facial
expressions during the trial, the trial court took the motion under
advisement. Later, the court denied the motion for a mistrial on the
basis that not all the comments were improper and the improper
comments did not rise to the level required for a mistrial.
 Dr. Sharon Byrd, a pediatric neuroradiologist, testified as
defendant's expert witness. After explaining shaken baby syndrome,
also known as the shaken impact syndrome, she stated that she had
identified hundreds of victims of shaken baby syndrome. 
 Dr. Byrd testified that Christopher's March CT scan showed a
skull fracture, subdural hematoma, and an area of dying brain cells,
called an infarction, which involved 66% to 80% of Christopher's
forebrain. Dr. Byrd discussed how the infarction was caused by a
sheering injury that involved the brain's vessels. That infarction,
not the subdural hematomas or the skull fracture, was the cause of
Christopher's death. Since there was no treatment available for the
infarction, Dr. Byrd opined that no medical treatment could have
prevented the progression of the brain damage shown in the March CT
scan and the outcome would have been the same even if the CT scan had
been properly read in March. Accordingly, Dr. Byrd believed that
taking Christopher out of his home after his March discharge would
not have changed the outcome.
 Dr. Byrd disagreed with Dr. Soter's interpretation of the March
CT scan and her opinion that hydrocephalus caused Christopher's
death. Dr. Byrd stated that Dr. Soter did not see the infarctions,
or dying brain cells, present in the March CT scan. Dr. Byrd
believed that the subdural hematomas that were present in March
caused Christopher's big head, not hydrocephalus. 
 Dr. Byrd testified that Christopher's death was caused by the
shaken impact syndrome, which occurred when his mother shook him and
threw him to the ground. Following that injury, Christopher's life
expectancy was one to two years. She then stated that his injuries
were consistent with being shaken for 10 to 15 minutes. On cross-
examination, Dr.Byrd said that defendant's attorney had "recently"
told her that Christopher had been shaken for 15 minutes and dropped
to the floor. 
 After closing arguments and deliberations, the jury returned a
verdict in favor of defendant on all counts. Subsequently, the trial
court denied plaintiff's motion for a new trial. 
 There was no dispute that Hunter shook and dropped Christopher,
causing the subdural hematoma and skull fracture, then waited
approximately one week before taking him to the hospital, where she
failed to report the abuse. There also was no dispute that the March
6, 1987, CT had been misread. The ultimate issue at trial was
whether misreading the CT scan in March was a proximate cause of
death or whether the damage was so great in March 1987 that
Christopher was irreparably injured and would have died even if the
CT scan had been properly interpreted.
 Plaintiff asserts that Dr. Byrd's expert opinion should have
been excluded because it was conjecture based on being told by
defendant's attorney that Christopher had been shaken for 10 to 15
minutes, which was not proven.
 Although an expert may not guess, conjecture, or surmise as to a
possible cause for the injury, she can testify in terms of
possibilities or probabilities as long as the opinion is based on a
reasonable degree of medical certainty. Baird v. Adeli, 214 Ill.
App. 3d 47, 65, 573 N.E.2d 279 (1991). Dr. Byrd testified that her
opinion was based on her review of the March 6, 1987, and July 6,
1987 CT scans, the July 13, 1987, MRI, Dr. Soter's testimony at
Hunter's criminal trial, Dr. Salkin's deposition, and the hospital
medical records from March and July. She said nothing about relying
on the statement by defendant's attorney, that Christopher had been
shaken for 10 to 15 minutes, and there is nothing in the record to
suggest that she did so.
 Dr. Byrd testified as follows:
 "[Christopher's death] was caused by the shaken impact
 syndrome. It was caused by the mother shaking Christopher
 Hunter, throwing him to the ground, lacerating these
 vessels involving his brain that produced the infarction
 that ended up producing the brain damage. That's what
 caused Christopher Hunter's death."
 At the close of her testimony, Dr. Byrd was asked:
 "[D]o you have an opinion based on a medical -- reasonable
 degree of medical certainty whether or not the injuries
 that were caused to Christopher Hunter that showed up on
 the March of '87 -- March 6th of 1987 CT scan are
 consistent with the child having been shaken -- severely
 shaken for 10 to 15 minutes?"
 Dr. Byrd answered, "Yes." On cross-examination, she stated that
defendant's attorney had told her "recently" that Christopher had
been shaken for 10 to 15 minutes.
 Dr. Byrd's opinions regarding the existence of injury shown on
the March CT scan, the severity of that injury, and her prognosis
were properly based on her review of the medical records and her
experience in diagnosing shaken baby syndrome. See Aguinaga v. City
of Chicago, 243 Ill. App. 3d 552, 563, 611 N.E.2d 1296 (1993). They
were well within her expertise since she is a neuroradiologist who is
experienced in diagnosing shaken baby syndrome. It was for the jury
to decide whether Dr. Byrd's testimony was believable and whether her
testimony should have been weighed more or less favorably than the
testimony of the other doctors. People v. Mullen, 141 Ill. 2d 394,
403, 566 N.E.2d 222 (1990); People v. Collins, 106 Ill. 2d 237, 261-
62, 478 N.E.2d 267 (1985).
 Furthermore, the length of time Christopher had been shaken was
not crucial to the determination of this case. There is no dispute
that Christopher had been severely shaken. Hunter testified that she
shook Christopher three to five minutes before dropping him to the
ground. Even if Christopher had been shaken only for three to five
minutes, instead of 10 to 15 minutes, that would not have changed the
amount of brain damage present when Christopher was admitted to the
hospital in March 1987 after being shaken by his mother. Therefore,
Dr. Byrd's testimoy was properly admitted into evidence.
 Next, plaintiff asserts that she was deprived of a fair trial
because the trial court erroneously denied her three mistrial motions
and her motion for a new trial. Plaintiff's first motion for a
mistrial was based on the defense attorney's opening statement
remarks that Hunter shook Christopher for 15 minutes, which violated
an in limine order, and that plaintiff's expert was paid to review
cases. Plaintiff waived this argument because her post-trial motion
was not sufficiently specific to preserve the issue. Brown v.
Decatur Memorial Hospital, 83 Ill. 2d 344, 348, 415 N.E.2d 337
(1980); Balsley v. Raymond Corp., 232 Ill. App. 3d 1028, 1029, 600
N.E.2d 424 (1992). 
 The second motion for a mistrial was based on defendant's
attempt to elicit testimony from Linda Barstatis, Christopher's
foster mother, that Christopher's family did not visit him, even
after the court had sustained plaintiff's objections four or five
times and had admonished defendant's attorney to "stay away" from
that line of questioning. The defense attorney also asked Barstatis
about Christopher's life expectancy and whether his family contacted
Barstatis after his death. The trial court repeatedly sustained
plaintiff's objections to those questions.
 Defendant argues that those