**Harry Norman Boose, Plaintiff-Appellee, v. Salvatore Digate, Defendant-Appellant, and Ralph Erickson, d/b/a Prairie Lake Hunt Club, Defendant.**

Gen. No. 68–84.

Third District.

March 26, 1969.

George Hupp, of Ottawa, for appellant.

Peter F. Ferracuti, of Ottawa, for appellee.

STOUDER, P. J.

Plaintiff-Appellee, Harry Boose brought this action in the Circuit Court of LaSalle County seeking damages for the alleged negligence of Salvatore Digate, Defendant-Appellant and Ralph Erickson, Defendant, d/b/a Prairie Lake Hunt Club. A jury returned a verdict in favor of plaintiff Boose against defendant Digate assessing damages at $40,000 from which judgment the defendant has appealed. The jury also found the issues against the plaintiff and in favor of the defendant, Erickson and no cross appeal from the judgment entered thereon has been taken. Appellant's post-trial motions were denied.

On November 25, 1965, Ralph Erickson owned and operated the Prairie Lake Hunt Club, a controlled shooting area duly licensed by the State of Illinois. On the date in question plaintiff was, and had been, a Police Captain of the Ottawa Police Force for ten years. Since 1958 he had been a part-time guide at the Prairie Lake Hunt Club and in consideration of such services he was permitted to use the facilities of the club. On the date aforesaid, plaintiff, together with a young friend, Robert Blodgett, age fourteen, pursuant to prior arrangements

with the owner of the hunt club, had received permission to use the club's facilities. As they were approaching a duck shooting area, plaintiff was struck in the eye by a shotgun pellet discharged from the gun of defendant, Digate. As a result plaintiff lost the sight of his eye and such injury precipitated this action.

Defendant Digate, in seeking to reverse the judgment, assigns as error first, that improper evidence was admitted and considered by the jury and second, that the plaintiff was guilty of contributory negligence as a matter of law.

We shall first consider defendant's contention that inadmissible evidence was considered by the jury.

Dr. Ey, an ophthalmologist, treated plaintiff on and after the date of the injury and testified in plaintiff's behalf. During his direct testimony concerning the nature of the injury, the following ensued. "Q. Doctor, I will ask you if you have an opinion, based upon a reasonable degree of medical and surgical certainty, as to whether there might or could be any further complications with respect to either eye, by reason of the injury which you have described herein in the plaintiff, Mr. Boose? A. Yes. Q. And would you give us your answer? A. This particular eye has been severely damaged in the back. There is a possibility that . . . ." Whereupon the counsel for the defendant, Digate, made the following objection: "Your Honor, I object to the word 'possibility.' This is entirely speculative and conjectural. We are talking about what this is, a reasonable degree." Whereupon the Court sustained the objection. Plaintiff's counsel then argued that the question was based on a reasonable degree of medical and scientific and surgical certainty, and that the witness was honest enough to follow the instructions of the Court. Whereupon the Court stated: "I have heard the word 'possibility,' and I am not satisfied in my mind that a mere possibility is a medical or scientific certainty." The Court then addressed the witness as follows: "Don't

you understand the question?" Whereupon the witness answered: "I don't understand the question. I don't understand what reasonable degree, what reasonable certainty, exactly, means. 50 percent, 25 percent, 75 percent, or what is reasonable." The Court then responded as follows: "We can't improve the question any more than we have. If you are unable to understand the question, you may say so. You must base your answer upon reasonable, what is a reasonable degree of certainty in your field. I might say to you, Doctor, if you understand this, not one chance in a thousand, not one chance in a thousand of speculation or guess or conjecture or some hope or guess, but what in the field, what you understand would be a reasonable degree of assurance. Now, I can't improve any more on that. If you can answer the question, please do so. If you can't answer the question, say so." Whereupon the Doctor answered the question as follows: "A. This particular eye, the right one that was injured, has a 50 percent chance of being removed in the next ten years." Upon being asked the reason for his opinion the Doctor explained that a secondary glaucoma (pressure in the eyeball) could result, requiring removal of the eye. He also testified to the reasonable medical expenses of such an operation and problems incident to replacement of the eye with an artificial eye.

On cross-examination Dr. Ey was questioned by counsel for the defendant as follows: "Q. Doctor, Mr. Ferracuti asked you on direct examination about the matter, the future problems of the eye, and you made an answer to that question. You understand what the word 'speculation' means? A. Yes. Q. Is there an element of speculation in your answer which you gave here? Is there an element of speculation, Doctor? A. Yes, there is an element. Q. Doctor, you are guessing to some extent with respect to Mr. Boose's case, is that correct? A. With respect to Mr. Boose's case, yes. Q. So that there is an element of speculation and conjecture with respect to Mr. Boose?

A. Yes." Counsel for defendant, Digate, moved to strike Dr. Ey's answer concerning the possible eventual removal of the eye, for the reason the answer contained an element of speculation and that the witness was guessing with respect to the plaintiff's case, and that, therefore, the Doctor's answer did not conform to the requirements of the law. The Court denied the motion and allowed the testimony to stand.

It is well established that the opinions of experts are admissible as exceptions to the hearsay rule on the basis that such experts by virtue of their specialized experience, are able to present for consideration by a jury, matters which would otherwise be beyond the experience of an ordinary juror. An expert, like any other witness, is not permitted to testify concerning the ultimate issues in the case, the determination of which is the province of the jury. This necessarily requires that the opinion of an expert be couched in tentative terms. As a safeguard upon the reliability of such testimony, the expert witness, no matter how skilled or experienced, will not be permitted to guess or state a judgment based on mere conjecture. Schwartz v. Peoples Gas Light & Coke Co., 35 Ill App2d 25, 181 NE2d 826, and Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 34 NE2d 732. The guess of an expert is of no more probative value than the guess of any other witness and if the opinion of an expert is a guess, the expert is in fact not performing his function of providing information as a result of his alleged expertise. In general, the testimony of a medical expert may have two aspects, the first aspect being that related to causal relationships and the second dealing with the nature and extent of any resulting condition of ill health. While these aspects are not completely independent they do serve as a foundation for understanding the probative value of medical evidence. The three cases relied upon by defendant appear to be cases primarily concerned with the establishment of a causal relationship.

Schwartz v. Peoples Gas Light & Coke Co., 35 Ill App2d 25, 181 NE2d 826 (cause of a fire) ; Lyons v. Chicago City Ry. Co., 258 Ill 75, 101 NE 211 (cause of deafness) and Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 34 NE2d 732 (cause of death). In each of the foregoing cases the court concluded that the opinion on cause was based on conjecture, because the facts which were the basis of the opinions were not supported by the evidence. For example, in the Lyons case, supra, the doctor's opinion was based on a "suspicion" that plaintiff had sustained a fracture but there was no evidence that plaintiff had, in fact, sustained any fracture.

■ ■ In the instant case it appears that the Doctor was unfamiliar with the legal phraseology which gives a medical opinion its legal perspective. The testimony objected to relates to the nature and extent of plaintiff's injury and in particular to future conditions. What such future conditions will be or will not be is a matter of foresight and necessarily a somewhat cloudy vision of the future. When a Doctor is asked to base his opinion on a reasonable degree of medical certainty the certainty referred to is not that some condition in the future is certain to exist or not to exist. Rather, the reasonable certainty refers to the general consensus of recognized medical thought and opinion concerning the probabilities of conditions in the future based on present conditions. In this context we do not believe the cross-examination of the Doctor reveals that in a legal sense the Doctor's opinion was based on guess or surmise. The speculation referred to by the Doctor was, we believe, a recognition that there was nothing in the plaintiff's present existing physical condition from which it could be concluded that plaintiff would or would not be one of those patients requiring eye removal at some time in the future. In his direct testimony the Doctor described the medical basis, i. e., development of a secondary glaucoma, which might affect plaintiff's condition in the future. Therefore his

conclusions concerning future probabilities were not based on guess or surmise and in our opinion his testimony was admissible and properly considered by the jury. Theodosis v. Keeshin Motor Express Co., 341 Ill App 8, 92 NE2d 794, and Williams v. Walsh, 341 Ill App 543, 95 NE2d 743.

This brings us to defendant's contention that the only conclusion warranted by the evidence is that plaintiff was guilty of contributory negligence as a matter of law. Since this question involves the application of the rule in Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 229 NE2d 504, a summary of the evidence, considered in its aspects most favorably to the plaintiff is required. On the premises of the hunt club is located a small narrow lake, three to four hundred yards long, running generally from east to west. On the north side of the lake two dirt ridges or mounds had been constructed more or less paralleling the lake. In the hollow between such mounds, four duck blinds had been constructed. The blinds were small buildings enclosed on three sides with an angular roof. The open side, which faced north or northwest, limited the direction of fire to the north or northwest. Some three hundred yards to the northwest was located the holding area for ducks. As the ducks were released they tended to fly toward the lake and could be shot by hunters in the duck blinds facing in a general north or northwest direction. The ridges of earth and the blinds were designed to limit the direction of shooting to the north or northwest and were further designed so that any shooting in a horizontal direction would result in the shot being directed at the ridge lying to the north of the blinds. The area south of the lake had formerly been used as a hunting area but at the time of the incident a golf course was being constructed at this location. A clubhouse was located southeast of the lake some six hundred feet.

424

Plaintiff had ascertained that one of the duck blinds was not being used on the day of the incident and he, together with Blodgett, was proceeding from the clubhouse to the duck blind area along the south side of the lake. The path took them over a green which was under construction. When plaintiff was about one hundred feet from the green, he observed defendant Digate standing on the mound on the north side of the lake, south of the duck blinds, with his gun cradled in his arms. When plaintiff reached the center of the green, a distance estimated at from thirty to forty yards from where defendant Digate was standing on the other side of the lake, plaintiff observed a low flying duck approaching from the west and at the same time saw defendant raise his gun to his shoulder and commence tracking the duck. In tracking the duck, defendant swung around about ninety degrees and was facing south at the time he discharged his gun at the duck resulting in the pellet striking plaintiff in the eye. As defendant commenced to track the duck, plaintiff pushed his companion to the ground and was in the process of falling to the ground himself when struck by the pellet. Plaintiff saw defendant as the former was approaching the green but did not call out or otherwise make any audible signal.

One of the rules of the club was that any person approaching a danger area was required to give an audible signal of his approach. Another rule of the club prohibited shooting from the ridge running northerly along the lake and limited duck shooting to the duck blinds. It is the failure of plaintiff to give an audible warning of his approach which it is argued constitutes contributory negligence as a matter of law. There is some dispute in the evidence concerning the purpose of defendant's presence on the ridge and defendant's knowledge of any rule restricting duck shooting to the duck blinds. He had previously been hunting from one of the blinds lo-

cated in the hollow and according to his testimony he was given permission by his guide to shoot from the ridge, the guide denying that such permission was granted. Duck hunters sometimes went up on the ridge to observe the performance of their dogs in retrieving ducks from the lake and it does appear that the defendant had his dog with him for such purpose. So far as this case is concerned it may be inferred that defendant was at a place where the shooting of ducks was not ordinarily permitted.

On the basis of the foregoing facts we are unwilling to hold that plaintiff's failure to give an audible signal was contributory negligence as a matter of law. Although plaintiff may well have observed defendant at a time when the latter could have heard an audible signal if given, we believe the jury could have inferred that plaintiff was under no duty to give such signal because defendant was at a place where shooting was not permitted. The jury could further have inferred that plaintiff was not bound to anticipate that defendant would or intended to shoot from the ridge. The jury could also have inferred that by the time defendant's intention to shoot became apparent it was too late to make an audible signal and that plaintiff's efforts in attempting to avoid the consequences were sufficient under the circumstances. It is our conclusion that the issues were properly submitted to the jury and the resolution of such issues in favor of the plaintiff is supported by ample evidence. For the foregoing reasons the judgment of the Circuit Court of LaSalle County is affirmed.

Judgment affirmed.

ALLOY and RYAN, JJ., concur.