GLORIA ZAVALA, f/k/a Gloria Soto, Plaintiff-Appellant, v. POWERMATIC, INC., et al., Defendants-Appellees.

First District (3rd Division)   No. 1—91—3200

Opinion filed March 30, 1994.

Steinberg, Polacek & Goodman, of Chicago (Bruce D. Goodman, Bradley D. Steinberg, and Peg Griffiths, of counsel), for appellant.

Ross & Hardies (Michael H. King and Jon K. Stromsta, of counsel), and

Sweeney & Riman, Ltd. (John S. Huntley and Georgene M. Wilson, of counsel), both of Chicago, for appellees.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

This appeal involves the February 17, 1982, tragic accident of plaintiff Gloria Soto, who lost two of her fingers while operating a drill press, designed and manufactured by defendants. Following a jury trial, a verdict was rendered in favor of defendants. Plaintiff appeals on the basis of numerous trial errors.

On the date of the accident, Soto was employed by the Dabar Stamping Company where she operated brake presses, drill presses, welders and tapping machines. At the time of the accident, she was 29 years old with five years of prior experience operating various presses. On the day of the accident, Soto picked up her gloves at the Dabar office and began work on her assigned drill press. At the time of the injury, Soto was sitting on a stool with one foot on the front of the stool and one foot on the ground. Her hands were at her side and she was about to reach for the air hose in order to clean the shavings from the machine table. Before cleaning the shavings, she planned to turn off the machine but before she could turn it off, she sneezed. Upon sneezing, she lost her balance and slipped forward. Her left hand was then caught by the machine as she reached to hit the off button, and her right hand swung forward, causing the fingers on her right hand to be severed by the reamer.

Soto, the only eyewitness to the accident, testified that her injury occurred solely from her being cut by the reamer. She further stated that her right hand was cut when the reamer went between her middle finger and her ring finger. According to Soto, her glove never wrapped around the reamer. After regaining her balance, Soto realized that part of her glove and one finger from her right hand were lying on the table and the reamer was turned off. When she took her left hand away from the power button, the reamer started again. When Soto left the drill press, it was still running and her glove and finger were still on the table but not wrapped around the reamer. She later fainted and was awakened by co-workers in order to be transported to Loyola Hospital. As a result of the incident, Soto suffered the amputation of two fingers from her right hand.

Dr. Juan Angelats, a plastic surgeon at Loyola University's hand clinic, testified that he remembered working with Soto to determine if her fingers were salvageable. He performed surgery on the ring finger and middle finger, both of which had been amputated. Because the tissues were not in good condition, Angelats could not restore life to the two severed fingers. He estimated the injury resulted in a 35%

loss in the function of the right hand. But with regard to strength, he estimated the loss at 50%.

Soto later tested positive for carpal tunnel syndrome in the left hand caused by inflammation, as a result of overusage in the stronger hand. Angelats testified that with a reasonable degree of medical certainty, the injuries to Soto's right hand were consistent with falling on a cutting tool. He demonstrated how there were cutting edges in the palm of the hand and also around the back of the hand. When asked whether this was consistent with a glove being wrapped around a reamer he replied:

> "Usually what we see in those cases is that the whole skin has been removed and turned. In this particular case, *** you see a cutting edge, [a] very sharp cutting edge in there, so you know, [sic] whether she was wearing gloves or not, I think the cutting affect [sic] is there."

After repeated questioning on cross-examination, Dr. Angelats again restated that, in the case of a glove getting caught, the "skin gets dislodged from the rest of the tissue."

Dr. Terrence Willis testified as an expert witness on behalf of plaintiff that there are two classes of hazards associated with a drill press. The first hazard relates to the rotating reamer and the danger of coming into contact with the rotating tool. For example, one may inadvertently bump the reamer and then move away, resulting in lacerations. The second type of hazard Willis described as "entanglement," meaning "you get involved with the tool in some way and you can't get back out." Entanglement can be broken down into three subcategories.

The first group deals with the wearing of a ring on a finger, wherein the rotating tool grabs the ring and injures the finger. The second category is called a "wind up type," where for example someone is wearing loose clothing or a glove which begins to wind around the tool. As the winding becomes tighter, the person gets increasingly injured. The third type of entanglement is where the person gets involved with the press and cannot come back out of the rotating tool area. For example, in a slip and fall, there is no wind up, but there is the cutting hazard associated with the reamer.

According to Willis, the case at hand falls into the third type of entanglement where there is no wind up situation. This was simply a falling forward into the rotating tool, causing cutting injuries to the hand. Willis also testified that in his opinion, insofar as the likelihood of getting cut, it would not make a difference whether a person was wearing gloves or not. Willis also testified as to the design of the drill press and the safety precautions necessary to protect users. Willis

stated that Powermatic had failed to conform to certain general safety principles in that the hazards of its drill press could have been eliminated by design. There needed to be a metal barrier guard around the area protecting the operator of the drill. According to Willis, all of these general principles of safety were available as far back as the 1940s.

Richard Flanigan testified on behalf of Powermatic that the only danger of wearing gloves is the threat of an entanglement injury as opposed to a cut and that an entanglement would pull to cause the injury rather than cut across the skin. However, Flanigan stated that Soto's injury was not consistent with a "wind up" type of injury, since once the cloth is picked up and rotating, there is no cutting action. Had there been an entanglement, a wrist, arm or hand would have been injured without cuts.

Flanigan emphasized that the risk of injury and hazard was contact with the rotating tool and that, regardless of whether she was wearing gloves, if there had been a guard on the machine, there would not have been contact with the moving reamer and there would have been no injury.

Flanigan stated that the custom and practice in the industry may or may not reflect safety practices as it pertains to a product or the design of a product such as a drill press. Flanigan agreed that if Soto's glove had become entangled there would have been a wrist, arm or hand injury without any cuts. He said that if a guard had been on the machine and if Soto had made contact with the guard she would never have collided with the rotating reamer and would not have been injured. He further stated that the guard had always been sold as optional and not standard equipment.

Flanigan testified it was the custom and practice of Powermatic to do what is reasonable and practical in the area of safety precautions and that it was economically feasible for Powermatic to make a guard to be sold to complement its drill presses.

Fernando Carrillo was called by Powermatic to testify in his capacity as a Dabar employee and supervisor to Soto. He saw the reamer and Soto's glove only after the paramedics had arrived. Moreover, he never witnessed the injury nor did he talk to Soto about what had happened. Upon viewing the machine, he noticed that Soto's glove still contained the severed fingers. He was not aware of the existence of guards for drill presses at that time.

Expert for the defense, Dr. Edward Caulfield, an engineer, testified that the only basis for his opinion was Soto's prior testimony. Caulfield never attempted to confirm or dispute the facts as presented by Soto. He assumed that Soto's hands were caught and

"moved around backwards" until the fingers came off. He stated that the lack of a spindle guard had nothing to do with the injury. He based this opinion on his "reconstruction" of the accident as the drill operator. According to Caulfield, "expected users" will not wear gloves and will wear short sleeves and hair nets, particularly around the drill press and other rotating type devices. He also stated that in his expert opinion, if Soto had not been wearing gloves, her fingers would not have been severed since she would have merely made contact with the reamer causing an abrasion. As to the proximate cause of Soto's injury, Caulfield stated:

"The proximate cause was on behalf of Gloria Soto, that she did wear gloves, the gloves entangled, she should not have worn gloves, and dressed appropriately to operate a drill press."

According to Caulfield, the result of this was an "entanglement" injury to Soto. Caulfield based all of his opinions on the assumption that Soto's fingers were ripped off and back, instead of being cut. The only reconstruction performed by Caulfield was the bending of his fingers to estimate what had happened. Pursuant to his assumptions, Soto's hand would have wrapped around the reamer in a clockwise direction. Caulfield said he did not believe Soto's deposition testimony that the reamer "was cutting her fingers off." He also did not view photographs taken by Dr. Angelats, showing Soto's cut hands. He admitted that he found Dr. Angelats' testimony reliable about the cutting of the fingers but he said the cutting was caused by the glove fabric and not the reamer. When asked whether the gloves caused the contact with the reamer, Caulfield could not say one way or the other. He agreed that if Soto had not been wearing gloves, because of the way the machine was manufactured, she inadvertently could have contacted the reamer. He also said that a barrier guard would have kept Soto away from the reamer.

The court denied the plaintiff's motion to strike the reconstruction testimony of Dr. Caulfield as being contrary to prior motions *in limine*.

The central issue on appeal concerns whether the trial court erred in allowing defendant's expert Caulfield to testify that the injury resulted from an "entanglement" where Caulfield's only basis for his opinion was the plaintiff's testimony. Plaintiff, her expert and her attending physician all testified that Soto was injured as the result of a "cutting" situation and not as the result of an entanglement with her gloves.

Plaintiff relies on *Royal Elm Nursing & Convalescent Center, Inc. v. Northern Illinois Gas Co.* (1988), 172 Ill. App. 3d 74, 79, 526 N.E.2d 376, for the proposition that Caulfield's testimony cannot be

supported by "mere conjecture, guess or suspicion." In *Royal Elm*, the expert rendered an opinion on a conclusion which was based on assumptions not in evidence or which was contradicted by the evidence. Moreover, an expert, like any other witness, is not permitted to testify concerning the ultimate issues in the case, the determination of which is for the province of the jury. (See *Boose v. Digate* (1969), 107 Ill. App. 2d 418, 246 N.E.2d 50.) For example, Caulfield testified that the "proximate cause" of plaintiff's injury was her glove. Yet no evidence was presented about the glove itself, its condition, its placement on the table after the accident or anything which suggests that the glove in and of itself contributed to the injury or which remotely suggests that the hand was "entangled." Both Dr. Angelats and Dr. Willis testified that an entanglement would be consistent with the skin and fingers being "pulled off." However, all of the evidence shows that the fingers were cut off. Reconstruction testimony such as that rendered by Caulfield is admissible where the expert is qualified and where the testimony will aid the fact finder in the resolution of the dispute. The availability of eyewitness testimony is but one factor in determining whether the expert will aid the fact finder. *Rios v. Navistar International Transportation Corp.* (1990), 200 Ill. App. 3d 526, 558 N.E.2d 252.

In the case *sub judice*, Caulfield's testimony was not only based upon mere conjecture, it also unfairly invaded the province of the jury on the issue of proximate causation. It was up to the jury to decide whether or not the glove played any role in engendering the amputation of two of the plaintiff's fingers. There were no reconstruction models or experiments made which would proffer any evidence of the glove entangling in such a case as this. There was no evidence of the condition of the hand or severed fingers suggesting that they had been entangled. The only evidence proffered was that both the fingers and hand had been cut.

Based upon the foregoing facts and case law, we find that the trial court improperly admitted the testimony of Caulfield on the issue of entanglement and proximate causation. Therefore, we remand this cause for a new trial and we need not consider the remaining issues on appeal.

Reversed and remanded.

RIZZI and CERDA, JJ., concur.